2020 IL App (2d) 190905-U
No. 2-19-0905
Order filed May 26, 2020

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| *In re* MARRIAGE OF COLLEEN KENT | ) | Appeal from the Circuit Court |
| | ) | of Du Page County. |
| Petitioner-Appellant, | ) | |
| | ) | |
| and | ) | No. 17-D-809 |
| | ) | |
| LUIS CORTEZ, | ) | Honorable |
| | ) | Michael W. Reidy, |
| Respondent-Appellee. | ) | Judge, Presiding. |

JUSTICE JORGENSEN delivered the judgment of the court.
Justices Bridges and Brennan concurred in the judgment.

**ORDER**

¶ 1    *Held*:  The trial court did not err in entering various rulings in this marriage dissolution case, including orders concerning the division of marital property, the valuation of retirement benefits, and attorney fees.  Affirmed.

¶ 2    Petitioner, Colleen Kent, appeals from the trial court's order, dissolving her marriage to respondent, Luis Cortez.  She challenges several of the trial court's rulings, including those concerning the division of marital property, valuation of retirement benefits, and attorney fees.  We affirm.

¶ 3                                I. BACKGROUND

¶ 4     The parties were married on October 27, 2002.  Two children were born to the parties during the marriage: M. (born on February 27, 2003) and C. (born on April 6, 2005).

¶ 5     On April 19, 2017, Colleen petitioned to dissolve the marriage.  On August 27, 2018, a parenting plan and allocation judgment was entered concerning the minor children.

¶ 6     Trial was held on July 17, and 18, 2019.  Colleen, age 51, testified that the parties purchased their home in Carol Stream in April 2016.  She lives there with her daughters, who are ages 16 and 14½.  Colleen works at Bright Star Healthcare Agency as a senior nursing assistant, providing hospice care in homes or facilities.  She had been working full time, but, given court-ordered mediation and counseling, her boss told her not to take any permanent cases.  Thus, Colleen works about 20 hours per week, earning about $12 per hour, although she sometimes earns $25 per hour.  Her work hours are dependent on what is offered by her employer.

¶ 7     Colleen plans to seek other employment, stating that she has always worked full time and usually worked two jobs.  Her gross monthly earnings are $1,997.25, and she receives $617 per month in maintenance and $1,048 in child support.  Colleen testified that she obtains supplemental food at a food pantry.  She has a monthly car loan expense of $609.  Luis has not contributed to expenses for the girls' extracurricular activities, and family loans also help pay these expenses.

¶ 8     Luis moved out of the house about two weeks after C. was born in April 2005.  He did not live with the family for several years.  Luis returned in 2009 and stayed through part of 2010.  He also lived inconsistently with the family in 2011.  In 2012, Luis left permanently.  Colleen petitioned for dissolution in 2017.

¶ 9     According to Colleen, Luis inconsistently paid for medical insurance for the minors.  There were periods when Colleen received Medicaid and food stamps.  Luis did pay for insurance for the minors from 2016 to 2019.  Addressing education, Luis paid for Catholic elementary school

expenses for M. She now attends a public high school. Colleen has not yet paid the $279 registration fee, but paid $20 so that M. could take the driver's education class (but not the $330 for the behind-the-wheel part of the class). Luis also paid school expenses for C. through 6th grade. A family member lent Colleen money to pay tuition for 7th and 8th grades.

¶ 10 Turning to medical expenses, Colleen testified that she incurred $25,549 in medical expenses for C. to treat three abscesses and MRSA in 2017.

¶ 11 Colleen's adjusted gross income in 2018 was about $23,874. Factoring in her income and expenses, Colleen has a monthly deficit of $3,130. She has less than $31 in savings and no retirement accounts. The mortgage on the marital residence, when brought current, is over $200,000.

¶ 12 Colleen's family lives in Spokane, Washington, Seattle, Washington, and Boise, Idaho. If the marital residence is sold, Colleen would rent housing. She wishes to remain in the marital residence. She also testified that she was offered a job "back home." Colleen is seeking counseling concerning her credit and is working with a real estate broker. She believes that she can obtain a mortgage loan in less than six months. She prefers to refinance the home in her name and obtain a quitclaim deed from Luis. First, however, all of the arrearages have to be paid. Colleen believes it would be in the minors' best interests to remain in the marital residence. The mortgage foreclosure complaint filed on April 24, 2019, was filed because the mortgage was not being paid.

¶ 13 Colleen will comply with any order for mediation. The family also went to counseling and had four different counselors. They did not continue with the counseling, because the parties could not agree on a counselor.

¶ 14 The marital home recently sustained water damage to the kitchen. The insurance checks went to the mortgage company, because the house is in foreclosure, and it released the funds to

contractors. Colleen and the girls lived outside the home for five months. Colleen testified that she did not deny Luis access to the home during this period. "No, we just had a meeting. I was not comfortable with him being there alone with me, that's for sure."

¶ 15    Colleen further testified that Luis had a child with another woman. It was "the defining thing" in terms of Luis's relationship with the parties' children. The minors, according to Colleen, "absolutely do not want anything to do with" Luis. The counselor, according to Colleen, noted that the girls should attempt reunification with Luis when they are ready. The girls have had visitation with Luis. "[I]t is a fight to get them in the car" to go to visitation, and "it takes about a week to undo. "[M.] said that she will never go. [C.] said absolutely not." Colleen has complied with all parenting-time orders. "My girls absolutely hate me right now."

¶ 16    Colleen denied that she failed to consult with Luis, per the allocation judgment, about the girls' extracurricular activities or enrolling them in Catholic school.

¶ 17    Colleen denied that, prior to the dissolution petition, Luis had a very close relationship with the minors and participated in their extracurricular activities. She agreed that he signed up to coach one of the girls' sports teams. Prior to the petition, Luis took one vacation with the girls. When Colleen found out that Luis had fathered a child with another woman, he was on vacation with the minors in Mexico. Prior to the time they found out about Luis's other child, the girls' relationship with him was, according to Colleen, "[i]nconsistent, rocky, distant."

¶ 18    Luis, age 49, testified that he lives in Oswego. The allocation judgment granted him parenting time with his daughters on the first Sunday of every month, from noon to 4 p.m. The judgment also allowed for parenting time to be extended after 90 days. It was not. He had no parenting time with the girls in 2019. He wants to attend reunification therapy with his daughters.

Prior to the filing of the dissolution petition, Luis's relationship with the girls was "very warm, very loving, very supportive."

¶ 19    Prior to 2017 and through the trial date, Luis communicated with the girls via text messages. He read various text exchanges from before the filing of the petition from M. that were loving. Several texts afterwards from M. stated that Luis should " Fuck off," and "I despise you." Others from Luis resulted in no response. A text to C. resulted in a response of "Leave me alone" or no response. He also read several long text messages that C. purportedly wrote, wherein she asked him to stop texting her and to leave her alone. Luis also read several text exchanges between himself and Colleen that began in December 2018, wherein he attempted to schedule his monthly visitation with the minors. They reflect that Colleen either did not respond, accused Luis of not answering his phone (or email) when Colleen contacted him, or accused Colleen of not answering the phone (or email or text) when Luis attempted to contact Colleen.

¶ 20    Prior to April 2017, Luis picked up and dropped off the girls every other day for school. He also prepared their breakfast, helped them with their homework, and attended parent/teacher conferences. Luis worked at the church, doing odd jobs so that the girls' tuition would be reduced. He also coached C.'s basketball team in 2015 or 2016. Luis had weekend parenting time.

¶ 21    Luis's January 24, 2019, financial affidavit reflected that his monthly income was $8,673 (reflecting 2018 income). He currently earns $8,804 per month in gross income. Luis works for United Airlines and is eligible for an annual bonus; when paid, it is paid out in the first quarter of the year. His United 401(k) plan account balance in the first quarter of 2019 was $286,255.17. Luis began working at United on October 27, 1997, and began participating in the 401(k) plan on that date. He has regularly contributed to the plan since commencement of his employment. He has taken out two loans from the plan to pay bills and expenses. The first loan, in October 2014,

has a remaining balance owed of $2,388.28. The second loan, taken out in April 2017, has a remaining balance of $21,184.

¶ 22    As of June 20, 2019, the balance in Luis's 401(k) account was $287,721.47. The balance in his RSU (restricted stock units) account was $6,709.78. Luis's investment account balance was $6,796.92. Luis also has two Putnam IRAs that he invested in prior to his marriage to Colleen. The balance in the first IRA, as of October 31, 2000, was $1,974.53. The balance in the second IRA, as of November 13, 2000, was $9,516.61. He rolled these IRAs into an AXA account at Primerica and did not make any additional contributions to them. The balance of this account as of July 14, 2019, was $18,082.08. Luis also opened two Roth IRA accounts two years ago. The balance is $427.48.

¶ 23    Luis owns a 2001 Toyota 4Runner that he purchased in 2007. It is worth about $2,500 and has 230,000 miles on it. He purchased the marital residence with Colleen in 2016. Both his and Colleen's names are on the title, but only Luis's name is on the mortgage. Colleen has not made any mortgage payments on the house. Property taxes and insurance are included in the mortgage payment, which is $1,776.03 per month. Luis paid every mortgage payment from the date of closing (in April 2016) through the date the dissolution petition was filed.

¶ 24    On June 27, 2017, a temporary support order was entered that directed Luis to pay the mortgage, child support ($1,048), and maintenance ($617). At the time, his gross income was $95,000 per year. Thus, he was paying more than 60% of his net income in mortgage payments, maintenance, and child support. Luis sought relief from the court to alleviate the financial burden of the support order by petitioning, on May 2, 2018, to sell the marital residence. The petition remains pending, and the house was never placed for sale. During the pendency of the

proceedings, Luis also moved to modify the child support and maintenance order, because Colleen obtained work as a certified nursing assistance. The petition remains pending.

¶ 25    Luis also sought a loan modification, but it was denied a forbearance. He stopped paying the mortgage in December 2018, and a foreclosure action was filed against him. In order to bring the mortgage current, Luis would have to pay about $25,000.

¶ 26    Luis also testified to the water damage to the marital residence. The amount still owed is $1,162.60. He learned of the water damage through his insurance agent. Colleen did not inform him of it. Luis also testified that he was not aware that Colleen and the girls had lived in a hotel. He was not permitted entry into the home to observe the damage. The total claim was for $50,000. There has never been a court order granting Colleen exclusive possession of the home.

¶ 27    During the marriage, starting in 2011, Luis went back to school to earn an M.B.A. degree. He took out loans to pay tuition, and the balance owed is $146,910.07. He does not make payments on the loan; it is in deferment. Addressing his credit-card debt, Luis testified that he owes the following amounts to various companies: $2,771.39, $4,634.54, $3,679.91, $3,579.71, and $833.99. Luis incurred these debts purchasing groceries, gas, paying for repairs, and travel.

¶ 28    Luis further testified that, since the entry of the allocation judgment, Colleen has not discussed with him the minors' participation in extracurricular activities or sought his approval for their registration in such activities. Nor has she submitted to him any bills for such expenses or education costs.

¶ 29    After the minors found out, in April 2017, about Luis having a son with another woman, his relationship with his daughters deteriorated. Currently, Luis supports his five-year-old son when he is able to.

¶ 30 Luis does not know the balance of his 401(k) account in December 1997 (near the start of his employment with United), and he does not know if he can obtain the figure online.

¶ 31 Addressing therapy, Luis testified that the family did not continue with the first therapist because she was not in his insurance network. The second therapist was also not in the network and Colleen did not like her. After the third therapist met with the girls and Colleen, she told Luis that she did not want to push the girls to have any more therapy sessions. Colleen's attorney then asked Luis if he would speak with Colleen before leaving the courthouse to try and schedule an appointment with a therapist for reunification counseling. He agreed.

¶ 32 Luis further testified that, after he pays for taxes, insurance, maintenance, child support, and loans, his monthly net income is $2,690.66. After subtracting the mortgage payment, Luis is left with $914.63 per month to pay for food, gas, clothing, rent, attorney fees, GAL fees, counselor fees, and other expenses.

¶ 33 Trial concluded, and the court issued its oral decision, dissolving the parties' marriage, on July 22, 2019.

¶ 34 On July 31, 2019, Colleen moved to re-open proofs. In her motion, Colleen sought to introduce a United 401(k) document dated March 31, 2002, which was near the time of the parties' marriage. She argued that she sent an Illinois Supreme Court Rule 214 (eff. July 1, 2018) discovery request and an Illinois Supreme Court Rule 237 (eff. July 1, 2005) production request that sought the document.

¶ 35 On August 14, 2019, Colleen moved to reconsider, raising, among others, arguments concerning a petition for rule to show cause, valuation of Luis's United 401(k) account, the division of marital assets, the division of attorney fees, and the sale of the marital residence.

¶ 36    On August 27, 2019, the trial court entered its written dissolution judgment order. It found that the parties had lived separate and apart since 2011. During the marriage, Luis fathered a son with another woman. The parties' residence was valued at about $234,000, and the net equity was about $20,000. Foreclosure proceedings commenced on April 24, 2019. The trial court noted that, pursuant to earlier orders, a portion of Luis's 401(k) plan was to be divided pursuant to a QDRO and that funds necessary to bring the mortgage current were to be paid from these funds. The court noted that Colleen wished to remain in the marital residence, and Luis petitioned to sell it, because he could not continue to pay his support obligations and the mortgage. Colleen testified that she hoped to qualify to refinance the mortgage.

¶ 37    The court found that Luis has a greater present and future earning capacity than Colleen, but that Colleen is underemployed. She testified that she formerly worked longer hours and that the court proceedings precluded her from working full-time. The court noted that both daughters were beginning high school and were involved in extra-curricular activities that would free up Colleen from devoting time to parenting responsibilities. The court imputed to Colleen $35,000 in annual gross income. Given Luis's annual gross salary of $105,600, the court ordered him to pay Colleen statutory guideline maintenance of $738.42 per month for 8.7 years. Given that Luis began paying temporary maintenance on June 27, 2017, the court noted that he should receive a credit for the 25 months he paid such maintenance, "as long as he additionally satisfies the mortgage arrearage." The remaining maintenance duration would be 6.5 years (or 79 months) and will terminate as of January 30, 2026.

¶ 38    Addressing the children, the trial court noted that it did not allow Luis a discount for his financial contribution to his son who is not a child of the parties' marriage. It ordered Luis to pay

Colleen $1,243 in child support per month. Each parent would pay 50% of the children's agreed-upon extracurricular-activity expenses, capped at $1,500 per child annually.

¶ 39    The court found that Luis stopped making mortgage payments in December 2018, and, on April 19, 2019, a foreclosure action commenced. The trial court found that neither party is in a financial position to maintain the home and that alternative living arrangements must be found, preferably before commencement of the 2019-2020 school year. The court granted Luis's petition to sell the marital residence and ordered that it be listed for sale within 30 days or by August 21, 2019. It further ordered that the residence be vacated by both parties on or before September 20, 2019. Upon the property's sale, the parties would equally share in the net proceeds or loss from the sale. The court ordered that Luis pay the mortgage until the residence was sold.

¶ 40    Next, addressing retirement accounts, the trial court found that Luis began employment with United on October 27, 1997, and the parties married on October 27, 2002. Thus, a portion of his United 401(k) plan was non-marital property. The court calculated the marital portion by utilizing the *Hunt* formula (see *In re Marriage of Hunt*, 78 Ill. App. 3d 653 (1979)): (marriage length of 174 months)/(261 months of employment with United) = 66.66% (marital portion of plan, or $196,712.57). The court awarded 33.33% of the plan as of the date of judgment as Luis's non-marital property ($97,382.46) and the remaining marital portion be subject to court orders dated May 7, and 30, 2019. It noted that 75% of the marital portion ($147,534.43) be divided pursuant to a QDRO and placed in escrow. The court further ordered that the following disbursements be made from the escrow account: $10,000 each to Fawell & Fawell and to The Trent Law Firm, an amount necessary to make the mortgage current, and the remaining balance to be equally divided between the parties.

¶ 41    Next, the court addressed Luis's United RSU's, ordering that they be equally divided between the parties via a QDRO (value: $7,224.91). Similarly, the court ordered an equal division of Luis's United Investment Account (value: $7,371.78). It awarded an AXA IRA to Luis as non-marital property (value: $18,082.08). The court ordered an equal division of a Primerica Roth IRA (value: $427.48), which it found was marital property.

¶ 42    The court awarded nominal amounts in bank accounts to the party in whose name the account was titled.

¶ 43    Addressing debts, the trial court found that Colleen's alleged debts were non-marital. It determined that there was no corroborative evidence, such as promissory notes or a repayment schedule, supporting Colleen's testimony that she had received loans from family. The court determined that there was no credible evidence that the purported loans were marital debt. It also determined that the evidence did not show that there were $25,000 in outstanding medical bills for Colleen and the minors, or evidence of any remaining debts. Turning to Luis, the trial court found that he presented vague claims of credit card debt (for alleged expenditures on the children), but provided no documentary evidence to support his claims. It noted that Luis resided for a period with his family and testified that he contributed to the rent and utility payments, but presented no corroborative evidence of such. The court found that Luis incurred a substantial portion of these debts while out of the marital residence, thus, they were incurred mostly for his benefit. The court noted that Luis has greater earning potential than Colleen and a greater ability to shoulder the burden of his credit card debt and the loans he took out against his 401(k) plan account. The trial court also noted that Luis mentioned that he may be receiving a worker's compensation claim or personal injury claim, but there was little evidence about these potential claims. Nevertheless, the court determined that Luis believed he was in a better position financially to pay his own debts.

Finally, addressing Luis's $140,000 in school loans, the court found that Luis would directly benefit from this expenditure and should be responsible for repayment.

¶ 44    Next, the court addressed attorney fees and found that Colleen was responsible for her attorney fees for the Abear Law Firm ($15,095). As to Luis's fees, the court found that he was responsible for his fees for Fawell & Fawell. The firm would receive $10,000 from the distribution of the marital portion of Luis's United 401(k), and he would pay $7,182.50 to the firm within 30 days. Next, addressing The Trent Law Firm, Colleen's counsel, the trial court noted that the firm had filed a contribution petition on July 18, 2019, seeking $43,367.48 in fees. "Considering this particular marital estate and the amount of debt these parties are carrying, the attorney[ ] fees incurred in this case are remarkable." Colleen, the court found, had incurred $69,612.48 in total fees and paid $9,150. Luis incurred $49,080 in fees and had paid $31,897.75. The trial court found that Colleen had not shown that she was unable to pay, "especially in light of the division of property, division of the 401(k) and allocation of the majority of the marital debts to [Luis]." The court further noted that Luis was paying $10,000 out of his 401(k) account to pay Trent pursuant to the May 7, and 30, 2019, orders. He also previously had paid $2,000 to Keven Thomas, Colleen's attorney. The court also noted that: the house would be sold and any equity equally split between the parties; the marital portion of the 401(k) would be divided and 75% of the proceeds split 50/50; and Luis was responsible "for the lion's share of the debts." Colleen did not have to divest her capital assets or deplete her means of support, but neither does Luis, the court noted. It found that, requiring Luis to pay more than what he had paid to cover Colleen's attorney fees would undermine his financial stability. Accordingly, the court denied Colleen's petition and entered judgment in favor of The Trent Law Firm and against Colleen for $43,367.48. It also entered an Illinois Supreme Court Rule 304(a) (eff. Mar. 8, 2016) finding.

¶ 45    On September 23, 2019, during argument on Colleen's motion to re-open proofs, which was somewhat confusing, Colleen's counsel noted that Luis had testified that he did not know the balance of his 401(k) account as of the marriage date. After trial, Luis's prior counsel told Colleen's counsel that she had been given documentation concerning the balance. Colleen's counsel attached the document, purportedly showing a $3,377.70 balance in March 2002, as an exhibit to the motion to re-open proofs. Counsel noted that he received the document after the trial, but noted that he had requested it in the production request. The trial court asked if the production request included a timeframe, and Luis's counsel stated that the request covered 2014 through 2018. The trial court, reading the document, concurred. Luis's counsel, who began representing Luis after discovery had closed, noted that Colleen's counsel was provided the statement during discovery and Colleen could have subpoenaed the document from United. Luis's counsel also argued that he did not have the statement during trial.

¶ 46    The trial court denied Colleen's motion to re-open proofs, finding that Colleen's counsel received the United document, but it was not clear when counsel received it. "The Court also believes that Mr. Trent was obligated to—he knew of this business. He could have subpoenaed these documents, if he so desired." Nevertheless, the court determined that the document was turned over prior to trial, not after trial. It also determined that application of the *Hunt* formula was correct, because it can be used for 401(k) plans, which are "arguably not a lot different from pension plans." Also, the court noted that the argument was raised after the court had already ruled.

¶ 47    The trial court also denied Colleen's motion to reconsider, finding that the *Hunt* formula applies to 401(k) plans. Further, it was "discoverable, and could have been discovered through diligence on the part of petitioner's attorney. I don't know what reasons it wasn't. This wasn't

something that came new to his trial strategy that at some point he just found out that he used to work for an airline." Addressing the equal division of marital assets argument, the court found that the case came down to dividing up the parties' debt. "It's a situation where these people are essentially really under water. So it's more so a situation of apportioning the debt, which I definitely apportioned a greater debt to [Luis]."

¶ 48    Next, addressing attorney fees, the trial court found that Colleen "was more litigious than [Luis], and I do generally rely on the fact that the attorney[ ] fees are the responsibility of the party that incurs them."

¶ 49    Turning next to the marital residence, the court found that the parties do not "have the ability to live there. [Colleen] has no ability to refinance this place." Neither party "can afford this place." The court found that the argument was not properly raised in a motion to reconsider because the court previously considered the issue, "in that it was unfortunate that these children have to move out of their family home, but that is a product of divorce."

¶ 50    The trial court also addressed Colleen's assertion concerning dissipation, finding that the notice of claim of dissipation was presented, but no argument or evidence was presented to the court. It characterized Colleen's assertion of the argument in her motion to reconsider as an attempt to take "a second bite at the apple." "I don't know why it wasn't presented before me, but it wasn't. So I can't just—just because something was handed to me, then do either side's side of the case and litigate for them. There was no evidence. No argument. As such, it is not newly discovered." Colleen appeals.

¶ 51                                    II. ANALYSIS

¶ 52    Colleen argues that the trial court erred in: (1) allocating the marital estate; (2) using the *Hunt* formula to determine the marital portion of Luis's 401(k) plan; (3) ordering each party to pay

their own attorney fees and costs; (4) crediting Luis with his payment of temporary maintenance; (5) denying Colleen's notice of dissipation; (6) ordering the sale of the marital residence; (7) ruling on Colleen's contempt petition; (8) denying Colleen's motion to re-open proofs; and (9) ordering reunification counseling. For the following reasons, we disagree.

¶ 53                                    A. Colleen's Brief

¶ 54    Preliminarily, we address Luis's argument that Colleen's brief should be stricken, because it violates the rules concerning appellate briefs. Illinois Supreme Court Rule 341(h)(3) (eff. May 25, 2018) requires, Luis notes, a statement of the standard of review for each issue presented. Colleen, he maintains, fails to do this, gives one standard for her entire brief, and incorrectly cites the standard for several arguments. Next, Luis argues that Colleen does not provide a proper statement of facts, in violation of Rule 341(h)(6). He argues that Colleen merely provides a one-page summary of the common-law record, providing the case's procedural history, and fails to provide a single reference to the testimony and evidence presented at trial. Next, Luis contends that Colleen's argument section violates Rule 341(h)(7), where the vast majority of that section does not contain proper citations to the record and where several arguments fail to contain citations to any legal authority. Luis requests that we strike Colleen's brief or find forfeited those arguments that are without citation to legal authority.

¶ 55    Colleen responds that her brief meets the requirements of Rule 341, contains citations to authorities where appropriate and necessary to support her arguments, and that any errors concerning the standard of review do not interfere with our review of the case, because Luis's "brief also contains a standard of review for each argument."

¶ 56    Compliance with 341(h) is mandatory. See *Voris v. Voris*, 2011 IL App (1st) 103814, ¶ 8. see also *In re Marriage of Hluska*, 2011 IL App (1st) 092636, ¶ 57 (our supreme court rules,

- 15 -

including Rule 341, are not merely advisory suggestions; rather, they are required to be followed).

Consequently, where an appellant's brief contains numerous Rule 341 violations and, in particular, impedes our review of the case at hand because of them, it is our right to strike that brief and dismiss the appeal. See *In re Marriage of Petrik*, 2012 IL App (2d) 110495, ¶ 38 (failure to follow Rule 341 may result in forfeiture of consideration of issues on appeal). Further, "[a] reviewing court is entitled to have the issues on appeal clearly defined with pertinent authority cited and a cohesive legal argument presented. The appellate court is not a depository in which the appellant may dump the burden of argument and research." *Thrall Car Manufacturing Co. v. Lindquist*, 145 Ill. App. 3d 712, 719 (1986).

¶ 57    We agree with Luis's recitation of the issues with Colleen's brief, but we decline his request to strike the entire brief. In our discretion, we strike her statement of facts, but choose to reach the merits of the appeal. See *North Community Bank v. 17011 South Park Ave., LLC*, 2015 IL App (1st) 133672, ¶ 14 (reviewing merits of the appeal despite appellant's numerous violations of Rule 341(h)). We strongly caution Colleen that Illinois Supreme Court Rules are mandatory and future violations will not be tolerated.

¶ 58                                 B. Allocation of Marital Estate

¶ 59    Turning to the merits, Colleen argues first that the trial court erred in allocating the marital estate. For the following reasons, we reject her argument.

¶ 60    The disposition of property in a dissolution-of-marriage proceeding is governed by section 503 of the Illinois Marriage and Dissolution of Marriage Act (Act) (750 ILCS 5/503 (West 2018)). Before a court may dispose of property upon the dissolution of a marriage, it must determine whether the property is marital or nonmarital. *In re Marriage of Henke*, 313 Ill. App. 3d 159, 166 (2000). After the trial court classifies the property, it awards each spouse his or her nonmarital

property and divides the marital property into just proportions. 750 ILCS 5/503(d) (West 2018). A trial court's classification of property as marital or nonmarital will not be disturbed on appeal unless it is against the manifest weight of the evidence. *In re Marriage of Romano*, 2012 IL App (2d) 091339, ¶ 44. Findings are against the manifest weight of the evidence where they are unreasonable. *In re Marriage of Bhati*, 397 Ill. App. 3d 53, 61 (2009).

¶ 61 Distribution of marital property is a matter within the discretion of the trial court, and, on appeal, we will not disturb the court's distribution of assets absent an abuse of that discretion. *In re Marriage of Tietz*, 238 Ill. App. 3d 965, 979 (1992). A trial court abuses its discretion where no reasonable person would take the view adopted by the court. *In re Marriage of Bernay*, 2017 IL App (2d) 160583, ¶ 13. The distribution of assets must be equitable in nature. *Id.* Although equal distribution "is generally favored" (*In re Marriage of Minear*, 287 Ill. App. 3d 1073, 1083 (1997)), the division "need not be mathematically equal to be equitable" (*Tietz*, 238 Ill. App. 3d at 979). The court is to consider all relevant factors, including: the duration of the marriage; the value of the property set apart to each spouse; the relevant economic circumstances of each spouse; the amounts and sources of each spouse's income; the age, occupation, vocational skills, employability, and needs of each party; whether the apportionment is in lieu of or in addition to maintenance; and the reasonable opportunity for each spouse for future acquisition of assets and income. 750 ILCS 5/503(d) (West 2018).

¶ 62 Colleen argues that a more reasonable division of assets would be 65% to her and 35% to Luis. Colleen argues that, given its longevity, Luis's employment with United is secure, whereas her employment, given her current employment status, is not. This factor supports, she contends, a finding that she is entitled to a larger portion of the marital property. She also argues that an additional consideration is that Luis was also awarded an AXA IRA valued at $18,082, along with

1/3 of his 401(k) plan (valued at $287,721.47) as his non-marital property. Colleen also contends that, as the parent with the vast majority of parenting time, she should have been awarded a greater share of the parties' marital property. Luis, she notes, has parenting time on one Sunday per month and on various holidays, with no overnights. Colleen views her inconsistent work history, nominal income, and lack of participation in retirement savings options as limiting her opportunity for future acquisition of capital assets and income. She contends that, in contrast, Luis has a long tenure with United and a good income.

¶ 63    We conclude that the trial court did not abuse its discretion in allocating the marital estate. The court ordered the sale of the marital residence and allocated to Luis $182,553 of $212,101 in marital debt. It also awarded Colleen maintenance. As Luis notes, all of these items are factors the statute provides be considered in allocating the marital estate. See 750 ILCS 5/503(a) (West 2018) (" 'marital property' means all property, including debts and other obligations, acquired by either spouse subsequent to the marriage," with some exceptions); 750 ILCS 5/503(d)(10) (West 2018) (court shall divide marital property in just proportions and considering all relevant factors, including "whether the apportionment is in lieu of or in addition to maintenance"). Colleen fails to explain how this allocation is unreasonable when all proper factors are considered.

¶ 64    Further, the trial court acknowledged Luis's greater present and future earning capacity, but also found that Colleen is underemployed, where, prior to the court proceedings, she worked longer hours. The court also noted that, with the minors' recent commencement of high school, Colleen would have to allocate less time to parenting and have more free time to devote to her job. As to the AXA IRA, the court did award that to Luis as a non-marital asset, but divided equally between the parties the United RSU's, the United investment account, and the Pimerica Roth IRA. Further, 75% of the proceeds from the United 401(k) account were equally divided. We also find

unavailing Colleen's argument that the court's allocation was erroneous, because the majority of the debts were incurred while Luis lived outside the marital residence and were incurred for his own benefit. She fails to note that the trial court acknowledged these facts. Further, in ruling on her motion to reconsider, the court characterized this case as coming down to dividing the parties' debts.

¶ 65    *In re Marriage of Forbes*, 251 Ill. App. 3d 133 (1993), upon which Colleen relies, is distinguishable. In *Forbes*, the reviewing court reversed the trial court's allocation of the marital estate, where the husband, the custodial parent, was awarded $62,000 of a net $274,000 estate; had no non-marital assets; had $70,000 in non-marital debts; and earned $20,000 at a job where the business was failing. *Id.* at 136-37. The wife, in contrast, had $1 million in non-marital assets; teaching experience, which, the court noted, could increase her income if she returned to the profession; and was awarded the marital residence. *Id.* at 137. The husband, the court further noted, did not receive maintenance and would be unable, with the assets awarded to him, to continue to enjoy the lavish lifestyle the parties enjoyed during their 22-year marriage. *Id.* Here, in contrast and as noted, the majority of the marital debt was allocated to Luis and maintenance was awarded to Colleen. Colleen ignores these factors.

¶ 66    Finally, we reject Colleen's argument that Luis may be in receipt of a worker's compensation or personal injury award. The trial court reasonably found that there was insufficient evidence concerning these claims, and they did not weigh in its assessment.

¶ 67                              C. Use of *Hunt* Formula

¶ 68    Next, Colleen argues that the trial court erred in utilizing the *Hunt* formula to determine the marital portion of Luis's United 401(k) account. We reject her argument.

¶ 69    The *Hunt* formula, or proportionality rule, is "widely accepted by Illinois courts in allocating the division of unmatured pension interests." *In re Marriage of Richardson*, 381 Ill. App. 3d 47, 52 (2008) (citing cases). Under the formula, "the marital interest in a pension benefit is determined by dividing the number of years or months of marriage during which pension benefits accumulated by the total number of years or months benefits accumulated prior to retirement or being paid." *Id.* "The value of the marital interest is then calculated by multiplying the amount of each benefit payment as it is disbursed by the marital interest percentage." *Id.*

¶ 70    Here, the trial court calculated the marital portion of Luis's 401(k) account by utilizing the *Hunt* formula: (marriage length of 174 months)/(261 months of employment with United) = 66.66% (marital portion of plan, or $196,712.57). The court awarded 33.33% of the plan as of the date of judgment as Luis's non-marital property ($97,382.46).

¶ 71    Colleen argues that the *Hunt* formula does not apply to determine the benefits of a defined contribution plan such as Luis's 401(k) plan.

¶ 72    Generally, defined benefit plans "provide a fixed, regular payment upon retirement determined by a formula giving the participant credit for years of service and other factors such as age and salary." See, *e.g.*, *Carmichael v. Laborers' & Retirement Board Employees' Annuity & Benefit Fund of Chicago*, 2018 IL 122793, ¶ 53. In a defined contribution plan such as Luis's United 401(k) plan, by contrast, "the participant is not entitled to any guaranteed, fixed, and regular payments upon retirement"; rather, "the participant is entitled only to the accumulated value of contributions at the time of any withdrawal." *Id.* See also *In re Marriage of Blackston*, 258 Ill. App. 3d 401, 402 (1994) ("Under a defined-benefit plan, *** the benefits received by an employee are determined by a formula, which generally takes years of service and salary into consideration but which is not correlated with the amount of contribution made by the individual employee.

Under a defined-contribution plan each participant has a separate account, and the benefit earned by the employee is based on the balance in his or her account.").

¶ 73    Colleen, citing only to *Hunt*, contends that *Hunt* does not apply to a defined contribution plan. In *Hunt*, the husband had interests in both his employer's pension and profit sharing plans and the court's holding applied to both plans. *Hunt*, 78 Ill. App. 3d at 655, 663-64. The case does not state whether the profit sharing plan was a defined benefit or defined contribution plan, but, generally, a profit sharing plan is a type of defined contribution plan. *In re Jacobs*, 403 B.R. 565, 578 (N.D. Ill. 2009). Thus, the only case upon which Colleen relies appears to apply the same formula to both type of plans. Thus, we cannot conclude, in light of *Hunt* and Colleen's failure to cite supporting authority, that the trial court erred in determining that the *Hunt* formula applies to 401(k) plans and utilizing such formula to determine the marital portion of Luis's 401(k) account.

¶ 74                                D. Attorney Fees and Costs

¶ 75    Colleen next argues that the trial court erred in ordering each party to pay their own attorney fees. She maintains that her limited income shows she is unable to pay her attorney fees and that Luis, whose income is three times her own (and, after payment of maintenance, is more than twice her own), is able to pay a portion, if not all, of Colleen's fees, which, with her debt, are in excess of $90,000.

¶ 76    "[T]he trial court's decision to award fees is a matter of discretion and will not be disturbed on appeal absent an abuse of discretion." *In re Marriage of Nesbitt*, 377 Ill. App. 3d 649, 656 (2007).

¶ 77    As a general rule, attorney fees are the responsibility of the party who incurred the fees. *Berger v. Berger*, 357 Ill. App. 3d 651, 662 (2005). Section 508 of the Act, however, allows for contribution to attorney fees, "where one party lacks the financial resources and the other party

has the ability to pay." *In re Marriage of Schneider*, 214 Ill. 2d 152, 174 (2005). The allocation of assets and liabilities, maintenance, and the relative earning abilities of the parties should be considered when determining an award of attorney fees. *In re Marriage of Carr*, 221 Ill. App. 3d 609, 612 (1991). A party seeking attorney fees must show two things: (1) an inability to pay; and (2) the ability of the other spouse to pay. *In re Marriage of Bussey*, 108 Ill. 2d 286, 299-300 (1985).

¶ 78    The trial court determined that Collen had incurred $69,612.48 in total fees and paid $9,150 and that Luis incurred $49,080 in fees and had paid $31,897.75. It also found that Colleen had not shown that she is unable to pay, "especially in light of the division of property, division of the 401(k) and allocation of the majority of the marital debts to [Luis]." Further, in denying Colleen's motion to reconsider, the trial court noted that Colleen "was more litigious than [Luis], and I do generally rely on the fact that the attorney[ ] fees are the responsibility of the party that incurs them."

¶ 79    We conclude that the trial court's determination was reasonable. Colleen notes in her reply brief that, after application of maintenance, Luis's income is $96,738.96 per year, and her income is $43,861.04. This disparity is not as great, thus, as she initially argued. The trial court found that Luis has a greater earning potential, but also determined that Colleen is underemployed and more litigious. Luis was also allocated more of the marital debt, though the student loans were incurred for his benefit. However, by Colleen's calculation, Luis was allocated $182,553 of martial debt and she owes in excess of $90,000 in total debt and attorney fees. The trial court did not abuse its discretion, in our view, in light of the parties' incomes, the fact that Luis pays maintenance, was allocated a significant portion of the marital debt, and must pay his own attorney fees, and where Colleen is underemployed and more litigious.

¶ 80                                        E. Temporary Maintenance Credit

¶ 81    Next, Colleen argues that the trial court erred in reducing the duration of maintenance. We disagree.

¶ 82    We review a maintenance award for an abuse of discretion. *In re Marriage of Schneider*, 214 Ill. 2d 152, 173 (2005).

¶ 83    The trial court determined that, given that Luis began paying temporary maintenance on June 27, 2017, he should receive a credit for the 25 months he paid such maintenance, "as long as he additionally satisfies the mortgage arrearage."

¶ 84    Colleen maintains that the disparity in the parties' incomes, the fact that the trial court ordered them to vacate the marital residence and that it be listed for sale, and that Colleen has substantially more parenting time demonstrate that no reasonable person would have given Luis credit for 25 months of maintenance. She contends that the fact that the credit is conditioned on Luis paying the mortgage arrearage is of no consequence. Colleen contends that she "desperately" needs the maintenance payments and that crediting Luis for temporary maintenance payments will compromise her ability to become financially independent.

¶ 85    Section 504(b-1)(1.5) of the Act provides: "In the discretion of the court, any term of temporary maintenance paid by court order under Section 501 may be a corresponding credit to the duration of maintenance set forth in subparagraph (b-1)(1)(B)." 750 ILCS 5/504(b-1)(1.5) (West 2018). We believe that the trial court reasonably exercised its discretion. The statute permits such a finding, and the fact that it conditioned Luis's credit on his paying the mortgage arrearage is consequential, contrary to Colleen's assertion, because it ensures that Luis meets all of his obligations.

¶ 86                                        F. Dissipation

¶ 87    Next, Colleen argues that the trial court erred in denying her notice of dissipation. We reject her argument.

¶ 88    A trial court's determination of whether a spouse dissipated marital assets will not be disturbed on appeal unless it is against the manifest weight of the evidence. *In re Marriage of Foster*, 2014 IL App (1st) 123078, ¶ 107.

¶ 89    Colleen notes that, on April 29, 2019, she filed a notice of claim of dissipation against Luis, alleging that he failed to make court-ordered monthly mortgage payments. Luis never filed a response, she further notes, thus, the allegations in the notice must be deemed admitted. Luis's failure to pay the mortgage, she asserts, resulted in the commencement of foreclosure proceedings. Colleen also asserts that the trial court made no findings concerning dissipation in either its letter opinion or dissolution judgment. Due to Luis's failure to pay the mortgage, she maintains, he failed to preserve a marital asset—the residence, and the amount of the dissipation should have been charged against Luis's share of marital property. The trial court's failure to make findings regarding dissipation, she argues, resulted in an inequitable division of property.

¶ 90    In ruling on Colleen's motion to reconsider, the trial court found that the notice of claim of dissipation was presented, but *no* argument or evidence was presented to the court. It characterized Colleen's assertion of the argument in her motion to reconsider as an attempt to take "a second bite at the apple." Further, the court stated, "I don't know why it wasn't presented before me, but it wasn't. So I can't just—just because something was handed to me, then do either side's side of the case and litigate for them. There was no evidence. No argument. As such, it is not newly discovered."

¶ 91    Dissipation is the use of marital assets for the benefit of one spouse for purposes unrelated to the marriage while the marriage is undergoing an irreconcilable breakdown. *In re Marriage of*

*Holthaus*, 387 Ill. App. 3d 367, 374 (2008). The party alleging dissipation must first make a *prima facie* showing that dissipation has occurred. *In re Marriage of Brown*, 2015 IL App (5th) 140062, ¶ 66. Once this showing has been made, however, the burden shifts to the party charged with dissipation to show with clear and specific evidence how the funds were spent. *In re Marriage of Stuhr*, 2016 IL App (1st) 152370, ¶ 65.

¶ 92 We reject Colleen's argument. In a temporary order entered on June 27, 2017, Luis was ordered to pay the mortgage. In May 2018, Luis had a filed motion to sell the marital residence and moved to modify his support and maintenance obligations. For about 18 months before he stopped paying the mortgage, Luis was paying 60% of his net income to Colleen and for the mortgage. Luis testified that he sought a loan modification, but it was denied a forbearance. He stopped paying the mortgage in December 2018, and a foreclosure action was filed against him. Indeed, the trial court found that neither party was financially able to maintain the marital residence. Based on this evidence, we cannot conclude that the trial court erred in rejecting Colleen's dissipation argument. Furthermore, as the trial court found, Colleen never raised the issue during trial or closing argument. See *In re Marriage of Heinrich*, 2014 IL App (2d) 122333, ¶ 62 (unconscionability argument forfeited, where it was raised for first time in motion to reconsider).

¶ 93                                      G. Sale of Marital Residence

¶ 94 Next, Colleen argues that the trial court erred in ordering that the marital residence be listed for sale within 30 days and that both parties vacate the residence within 60 days. For the following reasons, we disagree.

¶ 95 On appeal, we review the trial court's distribution of assets for an abuse of discretion. *Tietz*, 238 Ill. App. 3d at 979.

¶ 96    The trial court found that neither party is in a financial position to maintain the marital residence and that alternative living arrangements must be found, preferably before the start of the next school year. It granted Luis's petition to sell the residence and ordered that it be listed for sale within 30 days or by August 31, 2019. The court also ordered that the residence be vacated by the parties by September 20, 2019.

¶ 97    Colleen argues that, at the time of trial, she and the minors resided in the marital residence. She urges that children should be afforded continuity in their environment in order to reduce the emotional disruption caused by their parents' separation. Continued residence in the family home is one way, she notes, to accomplish this. Colleen also notes that she testified that she has no family in the area and might have to rent housing "back home." She preferred to continue residing in the marital residence and to refinance the mortgage and receive a quitclaim deed from Luis. She expected the process to take six months. The trial court, Colleen argues, did not consider the minors' best interests when it ordered the sale of the marital residence and did not properly consider her testimony that she has no family in the area.

¶ 98    We conclude that the trial court did not abuse its discretion. At the time of trial, the marital residence was in foreclosure and the trial court determined that neither party was in a financial position to maintain it. Colleen does not have a bank account or credit. The outstanding mortgage on the marital residence was in excess of $200,000. As Luis notes, Colleen did not provide documentary evidence that she would be able to refinance the mortgage within six months. She also testified that she sometimes obtained food by using food stamps or going to a food pantry. Thus, her assertion that she should and could keep the home is disingenuous. As to the children, she did not testify as to how any move would be detrimental to them. For example, Collen did not assert that the minors would have to change schools if the marital residence was listed for sale. It

was also not unreasonable for the trial court to order vacature within 60 days, preferably before the start of the school year, where it determined that the house could not be financially maintained, was in foreclosure. It could reasonably have determined that the parties needed to move on with their lives following the divorce. In sum, in light of the evidence of the parties' finances and the lack of evidence of any specific detriment to the minors of any move, we cannot conclude that the trial court's ruling was unreasonable.

¶ 99                                    H. Contempt Petition

¶ 100   Next, Colleen argues that the trial court erred in failing to address her contempt petition. We reject her argument.

¶ 101   "Whether a party is guilty of indirect civil contempt is a question for the trial court, and its decision will not be disturbed on appeal unless it is against the manifest weight of the evidence or the record reflects an abuse of discretion." *In re Marriage of Charous*, 368 Ill. App. 3d 99, 107 (2006).

¶ 102   Colleen notes that she petitioned for indirect civil contempt on July 9, 2018, for Luis's failure to pay the mortgage on the marital residence as required by a June 22, 2017, order. She also notes that, at trial, Luis testified concerning his failure to pay the mortgage. However, in its dissolution judgment, Colleen notes, the trial court failed to address her contempt petition. Thus, it left an outstanding issue open and neglected to set a purge amount for Luis's alleged non-compliance with the June 22, 2017, order. If Luis is found to have willfully violated the order, Colleen contends, an appropriate purge could be set that ultimately could take the property out of foreclosure and thereby increase the value of the marital estate.

¶ 103   We reject Colleen's argument. On April 11, 2019, the trial court set Colleen's petition for hearing on May 7, 2019. A May 7, 2019, order directed Luis to take a $10,000 loan out of his

401(k) account to pay the mortgage arrearage. During trial, Colleen did not ask that Luis be held in contempt. In ruling on Colleen's motion to reconsider, the trial court determined that no argument was made on the issue, "and there was scant evidence or testimony regarding it, it was tangent[i]al at best." The court further found that the evidence would not have shown willful or contumacious conduct. Based on our review of the record, we cannot conclude that this finding was unreasonable. As the trial court added, on May 7, 2019, the issue was "litigated," where Colleen had requested, and the court ordered, that Luis borrow from his 401(k) account to pay the mortgage arrearage. Thus, the issue was "litigated and handled."

¶ 104 In her reply brief, Colleen further notes that she filed *another* petition for rule to show cause on May 22, 2019, and, at one point in her reply brief, states that this is the petition that remained pending. At another point in her brief, she states that *both* petitions remained pending at time of trial and no findings were made as to either petition. Regardless, we reject Colleen's argument for failure to raise it at trial, because Luis was ordered to pay the arrearage, and because she points to no evidence that Luis's conduct was willful or contumacious.

¶ 105                              I. Motion to Re-Open Proofs

¶ 106 Colleen's next argument is that the trial court erred in denying her motion to re-open proofs to present new evidence concerning the value of Luis's 401(k) account at the time of the parties' marriage. We reject her argument.

¶ 107 We review a trial court's order denying a motion to re-open proofs for an abuse of discretion. *In re Estate of Bennoon*, 2014 IL App (1st) 122224, ¶ 53.

¶ 108 The trial court, in ruling on a motion to reopen proofs, considers: " 'whether the moving party has provided a reasonable excuse for failing to submit the additional evidence during trial, whether granting the motion would result in surprise or unfair prejudice to the opposing party, and

if the evidence is of the utmost importance to the movant's case.' " *General Motors Acceptance Corp. v. Stoval*, 374 Ill. App. 3d 1064, 1077 (2007) (quoting *Dowd & Dowd, Ltd. v. Gleason*, 352 Ill. App. 3d 365, 389 (2004)).  In a bench trial, greater liberty should be allowed in reopening proofs. *Dunahee v. Chenoa Welding & Fabrication, Inc.*, 273 Ill. App. 3d 201, 210 (1995).  "If evidence offered for the first time in a posttrial motion could have been produced at an earlier time, the court may deny its introduction into evidence."  *Chicago Transparent Products, Inc. v. American National Bank & Trust Co. of Chicago*, 337 Ill. App. 3d 931, 942 (2002).

¶ 109  In her motion to re-open proofs, Colleen argued that, although Luis's counsel, upon information and belief, received the 401(k) document from Luis's former counsel prior to trial, the document was not produced pursuant to Colleen's discovery requests.  At the hearing on Colleen's motion, the trial court, reading from the record, found that Colleen's discovery requests did *not* seek any 401(k) account statements from 2002.  It also determined that the retirement document was turned over prior to trial, not afterwards, although it was not clear when Colleen's counsel received it.  (At the hearing on Colleen's motion, Colleen's counsel—who was her third counsel and who began representing her one year prior to trial—stated that he received it from Luis's former counsel after trial.  Luis's counsel stated that she did not have the document.)  The trial court also determined that Colleen's counsel could have subpoenaed the document.

¶ 110  Based on this series of events and filings, we cannot conclude that the trial court erred in denying Colleen's motion to re-open proofs.  Colleen filed her dissolution petition in 2017, and trial commenced in 2019.  She, thus, had ample opportunity to seek the document, and, critically, she failed to request it in her discovery documents.  Thus, there was no error in denying her motion to re-open proofs.

¶ 111                              J. Reunification Counseling

¶ 112   Colleen's final argument is that the trial court erred in ordering reunification counseling. We reject this argument.

¶ 113   A trial court's determination as to the best interests of the child will not be reversed on appeal unless it is against the manifest weight of the evidence. *In re Marriage of Eckert*, 119 Ill. 2d 316, 328 (1988).

¶ 114   Colleen notes that, at trial, the court heard testimony concerning Luis's February 5, 2019, petition for rule to show cause, which alleged Colleen's failure to comply with the parenting plan and allocation judgment, as well as Colleen's failure to participate in mediation. In its dissolution judgment, the trial court found that Colleen was ordered to participate in reunification therapy. Colleen further notes that the ruling on Luis's petition for rule to show cause was not set forth in the dissolution judgment; rather, it was set forth in a July 22, 2019, order.

¶ 115   Colleen argues that there was no evidence presented that reunification therapy is necessary. Luis never showed interest in it, she contends, or in having a relationship with his children. Colleen also notes that Luis never sought review of his parenting time with the minors and, during the course of the parties' 17-year marriage, lived with the family for only two to five years. Further, during the marriage, he had a relationship with another woman with whom he had a child. Colleen also contends that the minors do not wish to have a relationship with their father, and their counselor stated that it should happen when the minors are ready.

¶ 116   We conclude that the trial court's order was not unreasonable. Luis testified to the good relationship he had with his daughters before they found out about his son. He also related a series of text messages whose tone changed after the revelation and whose authorship was questionable (*i.e.*, it appeared that Colleen had authored the hostile texts). He also testified to his frustrations in communicating with Colleen to arrange his parenting time. His testimony was not inherently

incredible on the issue of his relationship with his daughters. Thus, the trial court was not unreasonable in determining that therapy was warranted. Finally, we note that, during trial, *Colleen's* counsel instructed Luis to speak with Colleen about arranging reunification counseling, arguing that the family's relationship needed to be re-established. Clearly, this action undermines Colleen's argument on appeal.

### III. CONCLUSION

¶ 117 For the reasons stated, the judgment of the circuit court of Du Page County is affirmed.

¶ 118 Affirmed.